The STATE OF IOWA, ex rel. Thomas J. MILLER, Attorney General of Iowa, Danny and Carene Gettler, H.S. and Maxine Lovett, Robert S. and Hope Mendenhall and Tom and Linda Watkins, Appellants,

v.

John R. BLOCK, Secretary of the United States Department of Agriculture; the United States Department of Agriculture, an agency of the United States Government, Appellees.

No. 84–2278.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1984.

Decided Aug. 15, 1985.

Brent R. Appel, Des Moines, Ia., for appellants.

Ms. Wendy Keats, Dept. of Justice, Washington, D.C., for appellees.

Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

The State of Iowa (State) and several individual farmers (plaintiffs-intervenors in the district court) appeal from the district court's dismissal of their motion for a preliminary injunction to compel John Block, Secretary of the United States Department of Agriculture (Secretary), to implement three federal agricultural disaster relief programs. For reversal, the State and the farmers argue that the district court erred, first, in declining to accept subject matter jurisdiction on the ground that the Secretary's decisions under the discretionary programs are not reviewable in the courts; second, in approving the Secretary's actions according to "pragmatic factors"; and, third, in finding that the State lacked standing to sue as *parens patriae* on behalf of its citizens. Although we affirm the district court's finding regarding the State's lack of standing, we believe the district court erred in declining to accept subject matter jurisdiction of one of the programs. Accordingly, we reverse and remand for additional proceedings in accordance with this opinion.

## I. BACKGROUND.

In 1983, a devastating drought parched the agricultural midwest, including southern Iowa. Farm output fell to a fraction of its ordinary level and many farmers skirted the brink of financial ruin. To mitigate this disaster, Iowa's governor requested that the Secretary implement several discretionary federal disaster relief programs, which the Secretary declined to do. For purposes of this appeal, these programs included the Special Disaster Payment Program (SDPP), 7 U.S.C. § 1444d(b)(2) (1982); the Livestock Feed Program (LFP), 7 U.S.C. § 1427 (1982) (as implemented in 7 C.F.R. §§ 1475.1–17 (1982)); and the Emergency Feed Program (EFP), 7 U.S.C. § 2267 (1984) (as implemented in 7 C.F.R. §§ 1475.50–68 (1984)).[1]

---

1. The appellees properly point out that the enabling legislation of the Commodity Credit Corporation (CCC) precludes issuance of an injunction against the Corporation. 15 U.S.C. § 714b(c). ("The Corporation—* * * (c) may sue and be sued, but no attachment, injunction, garnishment or other similar process, mesne or final, shall be issued against the Corporation or its property.") Because issuance of benefits under the LFP, 7 U.S.C. § 1427, is administered under the auspices of the CCC, we are unable to authorize the relief requested by appellants, even if it were warranted. Similarly, the EFP's implementing legislation provides that "[t]he Secretary shall carry out the program * * * through the Commodity Credit Corporation." 7 U.S.C. § 2267(f). Accordingly, we are unable to consider appellants' request for an injunction under these statutes.

The SDPP, however, presents a different jurisdictional case. We believe that this Court has jurisdiction to require the Secretary to promulgate and implement regulations because as we note in IIB, the framing of regulations fulfills Congress's intent under the SDPP without necessarily requiring the Secretary to make payments or "carry out the program." *See Mitchell v. Block,* 551 F.Supp. 1011, 1015 (W.D.Va.1982).

The appellees also argue that judicial review is precluded by 7 U.S.C. § 1429, which provides, in pertinent part, that "[d]eterminations made by the Secretary under this Act shall be final and conclusive." The D.C. Circuit rejected this interpretation in *Gonzalez v. Freeman,* 334 F.2d 570, 575 (D.C.Cir.1964), in which it held that agency action "could be immune from judicial review, if ever, only by the plainest manifestation of congressional intent to that effect. * * * We find no such intent reflected in the statute." Based on our reading of section 1429, as well as of the texts and legislative history of the SDPP,

When the Secretary refused assistance under these programs, the State of Iowa filed an action in federal court seeking an injunction to compel him to implement the programs. After the action had commenced, six Iowa farm couples (who suffered under the drought and would be eligible for benefits under these programs) intervened as plaintiffs in the action. The district court heard argument on the motion for preliminary injunction and on the motion to dismiss and dismissed the action, finding that the State had no standing to litigate either on its own behalf or as *parens patriae*. The district court also found that it had no subject matter jurisdiction because the statute's broad grant of authority left the courts little or no law on which to review the Secretary's inaction. Finally, the district court also cited pragmatic considerations—deference to agency expertise—which required dismissal. The State and the intervenors appeal.

## II. SUBJECT MATTER JURISDICTION.

In determining that it lacked subject matter jurisdiction to consider the case at bar, the district court relied on a narrow exception to the grant of judicial review established in the Administrative Procedure Act (APA), 5 U.S.C. § 701(a)(2). In pertinent part, that section provides for judicial review of agency action "except to the extent that—* * * (2) agency action is committed to agency discretion by law." The Supreme Court has interpreted this section as applicable "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971), citing S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945). After reviewing the applicable legal standards and the relevant legislative and administrative materials, we conclude that the district court erred in declining to accept subject matter jurisdiction based on this provision.

Initially, we examine relevant case law to determine the sources from which we might derive "law to apply." In *Overton Park*, the Supreme Court held that the "agency discretion" exception to judicial review is "very narrow" and applies only in "rare instances." *Id.* In that case, the Supreme Court followed a careful pattern as it reviewed the language of the statute in question and its legislative history. Elsewhere the Supreme Court has specified what materials constitute the proper subject of inquiry in this type of case: "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute*, 467 U.S. 340, ——, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270, 275–76 (1984). Accordingly, we now turn to these legislative materials.

### A. The SDPP Statute and Supporting Legislative Materials.

The Special Disaster Payments Program (SDPP), which is without implementing regulations, presents sufficient legislative materials to assist reviewing courts. Under 7 U.S.C. § 1444d(b)(2), the Secretary "shall" make disaster payments to farmers on farms which are not covered by the Federal Crop Insurance Act (FCIA) (7 U.S.C. § 1501 *et seq.*) if the Secretary determines either that a natural disaster has prevented planting of feed grains or that a natural disaster has reduced the harvest of feed grains. 7 U.S.C. § 1444d(b)(2)(A) & (B). On farms that are covered by the FCIA, the Secretary "may make disaster payments" whenever he determines: 1) that, as a result of natural disaster, farmers have sustained "substantial losses of production"; 2) that other federal assistance programs are insufficient to alleviate the economic emergency; and 3) that "additional assistance must be made available"

we agree and decline to immunize the Secretary

in this case under the SDPP statute.

to eliminate the economic emergency. 7 U.S.C. § 1444d(b)(2)(D)(iii).

The legislative history of the bill is also illuminating in that it addresses the interaction of SDPP with the Federal Crop Insurance Program. Although the statute "does not specify the emergency situations" in which assistance under SDPP would be provided, Senator Heflin provided "some idea of the situations in which the Secretary could reasonably be expected to implement the disaster payments program." The list of examples, which was "not meant to be inclusive," included situations in which:

> (1) the Federal crop insurance policy excludes coverage for the disaster risk that caused the loss; (2) there was a lack of understanding of the crop insurance program among producers affected by the disaster; (3) the crop insurance program was not adequately sold in the area affected by the disaster, or the Federal Crop Insurance Corporation's educational efforts were inadequate; or (4) the Federal Crop Insurance Corporation used an inaccurate actuarial basis so that a producer affected by the disaster was unable to obtain coverage adequate to protect his crop sufficiently.

S.Rep. No. 126, 97th Cong., 1st Sess. 78, *reprinted in* 1981 U.S.Code Cong. & Ad. News 1965, 2042–43.

The appellants also direct our attention to a General Accounting Office (GAO) Report on USDA disaster aid payments under the Agriculture and Food Act of 1981. That report noted that the Act vests substantial discretionary authority in the Secretary to make these aid payments, yet it concluded that "USDA's use of this discretion should be based on objective criteria. However, USDA has not developed objective criteria to be used in awarding special disaster payments. This lack of criteria may result in subjective or inconsistent application of the Act." United States General Accounting Office, *Report to the Honorable Berkley Bedell, USDA Needs Objective Criteria for Awarding Special Disaster Payments* (Nov. 2, 1982) 15.

## B. Application of the Law.

Having reviewed the relevant legislative materials under the SDPP, we next review analogous case law to assist us in evaluating the statutes we have discussed. We find our recent decision in *Allison v. Block,* 723 F.2d 631 (8th Cir.1983), to be highly instructive. In that case, we considered the Secretary's failure to implement a program entirely, not simply his failure to grant aid in a particular case.[2] The Allisons, who had defaulted on Farmers Home Administration (FmHA) loans, sued the Secretary of Agriculture seeking a deferral of the foreclosure of their farm. The district court enjoined foreclosure on the Allisons' farm pending the Secretary's compliance with the deferral statute, 7 U.S.C. § 1981a (1982),[3] and we affirmed.

---

**2.** We regard this fact as the essential point distinguishing the Supreme Court's recent decision in *Heckler v. Chaney,* — U.S. —, 105 S.Ct. 1649, 84 L.Ed.2d 714 (Mar. 19, 1985), from *Allison* and the case at bar. In *Heckler,* the Court extended the language of 5 U.S.C. § 701(a)(2) (which excludes from judicial review "agency action * * * committed to agency discretion by law") to insulate from review the FDA's decision not to enforce the law proscribing unapproved use and misbranding of a drug. We believe that *Heckler's* consideration of an agency's decision not to enforce the law in a single instance presents an issue distinguishable from the Secretary's decision not to promulgate general regulations embodying the intent of Congress.

In addition, by analogy, the Court addresses and distinguishes the Secretary's inaction in the present case: "If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under section 701(a)(2), and courts may require that an agency follow that law." *Id.* — U.S. at —, 105 S.Ct. at 1657.

**3.** Section 1981a provides:

> In addition to any of the authority that the Secretary may have to defer principal and interest and forego foreclosure, the Secretary may permit, at the request of the borrower, the deferral of principal and interest on any outstanding loan made, insured, or held by the Secretary under this chapter, or under the provisions of any other law administered by the Farmers Home Administration, and may forego foreclosure of any such loan, for such

In *Allison*, as in this case, the Secretary argued that, because section 1981a establishes no administrative procedural requirements nor substantive rights, the statute does not require any administrative action. *Id.* at 634. In rejecting this argument, we observed that the Secretary's authority to defer foreclosure under section 1981a was predicated on two actions by the borrower which implicate procedural protections. First, the borrower must specifically request relief and, second, he must show that, due to circumstances beyond his control, he is temporarily unable to make payments without unduly impairing his standard of living. *Id.* Close reading of these provisions of the statute and the legislative history revealed that Congress intended that the Secretary notify borrowers of the availability of relief and that he promulgate "a uniform policy under which borrowers can make the requisite request and prima facie showing." *Id.* (citing the statute and legislative history stressing, among other things, that the statute's objective was to "giv[e] people a chance" at remaining solvent in farming).

In addition to finding the need for these procedural standards, we also determined in *Allison* that section 1981a "also requires the development of substantive standards at the agency level to guide the Secretary's discretion in making individual deferral decisions." *Id.* at 637. This conclusion was based upon the language in the statute which imposed upon the borrower the need to make a prima facie showing of circumstances beyond the farmer's control and the potential for an impaired standard of living. Finally, finding the terms "policy"

and "program" in the statute, we concluded that "Congress surely would not consider an empty procedural shell, with no substantive measure of relief, to be a policy at all." *Id.*

■■■ With the methodology of the *Allison* case as our guide, we find that the Special Disaster Payments Program presents a straightforward case which compels judicial review of agency inaction. Despite the fact that the statute specifies three criteria for determining the inadequacy of federal crop insurance, the Secretary has deliberately taken no steps to implement proper procedures to protect applicants from potential abuses of discretion under the statute. Moreover, the criteria presuppose findings about the inadequacy of crop insurance; as in *Allison*, the criteria suggest a "prima facie standard of eligibility for relief," *id.* at 637, yet without substantive elaboration by the Secretary, the criteria and the relief program become no more than "an empty procedural shell," and the clear intent of Congress to establish a program is thwarted. We also observe that, as was the case in *Allison*, the legislative history of this measure relies on the word "program," which becomes nonsensical unless the Secretary promulgates procedural and substantive standards under which disaster assistance can be disbursed. S.Rep. No. 126, 97th Cong., 1st Sess., 111, *reprinted in* 1981 U.S.Code Cong. & Ad.News 2076. Given the clear guidance of the statute, its supporting materials and case law, then, we find ample law to apply and we reject the district court's suggestion that judicial review was foreclosed by an absence of law.[4]

---

period as the Secretary deems necessary upon a showing by the borrower that due to circumstances beyond the borrower's control, the borrower is temporarily unable to continue making payments of such principal and interest when due without unduly impairing the standard of living of the borrower. The Secretary may permit interest that accrues during the deferral period on any loan deferred under this section to bear no interest during or after such period: Provided, That if the security instrument securing such loan is foreclosed such interest as is included in the purchase price at such foreclosure shall be-

come part of the principal and draw interest from the date of foreclosure at the rate prescribed by law.

7 U.S.C. § 1981a (1982).

**4.** As a separate issue on appeal, the appellants also challenge as erroneous the district court's reliance on "pragmatic considerations" which led it to defer to the Secretary's expertise and to conclude that implementation of these programs was not a proper subject for judicial review. In a recent case, this Court reviewed the pragmatic considerations which might influence the Court's decision:

■ It is not the business of this Court to order the Secretary to make payments under the SDPP to specific farmers. But when Congress has created a program which contemplates that such payments will be made in appropriate circumstances, it is the clear duty of the Secretary to promulgate regulations which carry out the intent of Congress.

## III. STANDING.

The State of Iowa also challenges the district court's conclusion that the State lacked standing to pursue this litigation, either by virtue of its own interests, or under a *parens patriae* theory.[5] We consider each in turn.

### A. The State's Standing to Sue on Its Own Behalf.

As the courts have frequently noted, standing requirements arise out of the Constitution and out of the courts' self-imposed prudential limitations on their own jurisdiction. *See Allen v. Wright,* —— U.S. ——, ——, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984). By thus carefully limiting the nature of the cases they hear, the federal courts "put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome," *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972), and they "assure[ ] an actual factual set-

ting in which the litigant asserts a claim of injury in fact." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). With this end in mind, we review the sources and nature of the standing limitation.

Under Article III of the Constitution, the judicial power of the United States is limited to the resolution of "cases" and "controversies." This familiar language has been interpreted by the Supreme Court "at an irreducible minimum" to require one seeking the courts' protection to " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' * * * and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (citations omitted).

The second category of self-imposed standing limitations are prudential principles which underscore the limitations embodied in Article III. Under these guidelines, the Court has required that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 445 L.Ed.2d 343

Among those pragmatic considerations are the nature of the administrative expertise involved, whether "there are discernible guidelines against which the agency decision may be measured," *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d 574, 579 (3d Cir.1979), and whether the decision is the product of "political, military, economic, or managerial choices that are not really susceptible to judicial review." *Id.*
*Story v. Marsh,* 732 F.2d 1375, 1379 (8th Cir. 1984).
 Although the resolution of this issue is implicit in our discussion of the district court's subject matter jurisdiction, reconsideration of the issue from this angle might be useful. It seems clear that the issue presented in this appeal does not turn on technical issues of the agency's substantive expertise. *Cf. Tuepker v. Farmer's Home Administration,* 708 F.2d 1329, 1332 (8th Cir. 1983) (Where Court found judicial review inappropriate, appellant had made "no claim alleg-

ing a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error 'going to the heart of the administrative determination' * * * [nor did he contend] that the FmHA made no appraisal of his farm.") Rather, as is clear from our discussion of the jurisdictional issue, we are met with the purely legal issue of whether there was law to apply in considering whether the agency acted contrary to Congress's intent in failing to implement the program at issue. No questions of agricultural economics arise on this consideration, and we are able to resolve the matter from a purely legal inquiry, which places the case within the courts' area of expertise.

5. The Secretary does not contest the standing of the individual farmers as plaintiffs-intervenors to the litigation. Accordingly, they may remain as named parties.

(1975). Moreover, under this principle, the federal courts should eschew "abstract questions" and "generalized grievances" which afflict a broad spectrum of the public. *Id.* at 499–500, 95 S.Ct. at 2205. Finally, the Court has drawn a requirement which links the party seeking relief to the provision on which he relies: the plaintiff's complaint must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

The Supreme Court's most recent standing discussion acknowledges the lack of "precise definitions" in this area and warns that the standing determination must not be converted to a "mechanical exercise." *Allen v. Wright,* ‒‒ U.S. ‒‒, ‒‒, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556, 570 (1984). The Court urged "careful judicial examination of a complaint's allegations" which might include the following questions:

> Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?

*Id.*

 Applying these tests to the facts in this case, we turn first to the constitutional issues of an injury in fact, its causal relationship to the defendant and the likelihood of redress by the remedy the appellants seek. In attempting to establish that it sustained an injury in fact, the State alleges that, but for the Secretary's implementation of these disaster relief programs, agriculture production will suffer, which will dislocate agriculturally-based industries, forcing unemployment up and state tax revenues down. As a result, the State will face increased responsibility for the welfare and support of its affected citizens while its available tax revenues are declining. The district court found that these injuries were "generalized grievances, shared by each citizen of Iowa," and it concluded that these injuries "fail to constitute distinct, palpable injuries to the State as a state." [6] We agree.

In reaching this conclusion, we follow the reasoning of the District of Columbia Circuit in *Commonwealth of Pennsylvania v. Kleppe,* 533 F.2d 668 (D.C.Cir.), *cert denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976), in which that Court denied standing to state officials seeking assistance from the Small Business Administration in rebuilding hurricane-ravaged businesses in Pennsylvania. That Court acknowledged that depleted tax revenues might be an actual economic harm to the State's interests, *id.* at 672, but it denied standing on the ground that this type of economic loss "is the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." *Id.* It regarded the tax loss as "largely an incidental result of the challenged action" and required "some fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged." *Id.* See also *Warth v. Seldin,* 422 U.S. 490, 504–07, 95 S.Ct. 2197, 2207–09, 45 L.Ed.2d 343 (1975) (appellants failed to allege "an actionable causal relationship" between appellee's zoning practices and appellants' asserted injury).

Conversely, the determination that the State of New York had standing to sue the federal Bureau of the Census in *Carey v. Klutznick,* 637 F.2d 834, 838 (2d Cir.1980), was based on a loss to the State more closely linked to the act in question. In that case, the State alleged that the census had undercounted residents of the City of New York, which had the effect of diluting

---

**6.** Although this kind of injury does not establish the necessary kind of injury-in-fact for the State to sue on its own behalf, it is the type of injury on which the State might base a *parens patriae* action against a private defendant. For the reasons we outline below, however, *parens patriae* is also an inappropriate basis for standing where the State sues the federal government.

the votes of city residents and distorting legislative reapportionment leading to underrepresentation of the city in Congress. The *Carey* Court found a "concrete harm" in dilution of votes and reduction of federal funds, and concluded that the injury was "traceable to the Bureau's actions." *Id.* at 838, citing *City of Camden v. Plotkin*, 466 F.Supp. 44, 47–51 (D.N.J.1978) (citizens who challenged census undercounts alleging loss of funds "established both an injury fairly traceable to the Census Bureau and a substantial probability" that court intervention will remedy the plaintiffs' injury). Likewise, in a variety of other cases, the Courts have found standing for the state when the link between the state and injury was more direct. *State of New York v. Heckler*, 719 F.2d 1191, 1195 (2d Cir.1983) (State has the right to litigate regulation requiring notification of parents regarding child's use of contraceptives because state might be spending funds with illegal conditions attached); *State of California v. Block*, 690 F.2d 753, 776 (9th Cir.1982) (state may challenge environmental impact statement if it is geographically proximate to the site and statute requires state consultation as a prerequisite); *Department of Energy v. Louisiana*, 690 F.2d 180, 187 (5th Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983) (state may challenge Department of Energy regulations which affect its finances adversely as a landowner and sovereign).

From these cases, we conclude that the State's alleged injury is insufficiently proximate to the actions at issue and the remedy to be offered by this action an insufficient guarantee of solvency to warrant state standing in this case. In the words of the *Kleppe* Court, "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impair-

ment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing." *Kleppe*, 533 F.2d at 672.

Having found that the State cannot establish a sufficient injury in fact to satisfy the constitutional requirements of standing, we need not consider the prudential standing requirements. We do, however, consider the State's standing as *parens patriae*.

### B. Standing to Sue *Parens Patriae* on Behalf of the Citizens of Iowa.

The State also maintains that it has standing to sue on behalf of its citizens who might otherwise be unable to seek legal redress for themselves. Although some state *parens patriae* suits against the federal government have occasionally been allowed in the past,[7] the most recent and well-reasoned discussions of this type of suit disallow its use against the federal government and reserve *parens patriae* instead for the state to vindicate the rights of its citizens against private defendants.

In the Supreme Court's most recent consideration of the issue, it elaborated the requirements for *parens patriae* standing in general terms. *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607, 102 S.Ct. 3260, 3268, 73 L.Ed.2d 995 (1982). In a footnote, however, it qualified that discussion and disallowed state suits against the federal government on a *parens patriae* theory:

A State does not have standing as *parens patriae* to bring an action against the Federal Government. *Massachusetts v. Mellon*, 262 US 447, 485–86, 67 L.Ed. 1078, 43 S.Ct. 597 [600] (1923) ("While the State, under some circumstances, may sue in that capacity for the protection of its citizens (*Missouri v. Illinois*, 180 U.S. 208, 241 [21 S.Ct. 331, 343, 45 L.Ed. 497]), it is no part of its duty or

---

7. *New York v. United States*, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947) (approving state standing without discussing *parens patriae*); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (same); *Washington Utilities and Trans-* *portation Commission v. F.C.C.*, 513 F.2d 1142, 1145–46 (9th Cir.), *cert. denied*, 422 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (same); *State of Florida v. Weinberger*, 492 F.2d 488, 493–94 (5th Cir.1974) (same).

power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae* "). Here, however, the Commonwealth is seeking to secure the federally created interests of its residents against private defendants.

*Id.* at 610, n. 16, 102 S.Ct. at 3270, n. 10. The D.C. Circuit had previously developed the rationale against state *parens patriae* suits against the federal government. That Court attributed the judicial unwillingness to liberalize *parens patriae* requirements to the general supervisory aspect of federal law and to the basic interests of federalism, "which reduce[ ] most basically to the avoidance of state interference with the exercise of federal process." *Commonwealth of Pennsylvania v. Kleppe,* 533 F.2d 668, 677–78 (D.C.Cir.), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976).

Although we recognize the considerable importance that the State of Iowa and its citizens place on the continued vitality of agriculture in the state's economy, we cannot allow the State to proceed as *parens patriae* in this case. To do so would intrude on the sovereignty of the federal government and ignore important considerations of our federalist system.

## IV. CONCLUSION.

Although we conclude that the State is without standing to pursue this action, the remaining appellants may do so on remand. On remand, the district court should promptly hold a hearing to consider appellants' requests for preliminary and permanent injunctive relief compelling the Secretary to implement the SDPP. The district court should note especially the imperative language in the statute ("shall" make disaster payments) and the close similarity that the plight of Iowa's farmers bears to the disasters contemplated by the statute and its legislative history. We express no opinion as to whether the Secretary ought to develop the statute's substantive standards under formal rulemaking procedures or individual adjudications. As we noted in *Allison,* formal rulemaking "would better insure a uniform set of substantive standards," but case-by-case adjudication may allow the consistent precedential use of previous decisions. *Allison,* 723 F.2d at 637–39. Whatever method is chosen, we emphasize that, if the programs are to be implemented, they must be implemented quickly so that eligible farmers may receive assistance at the earliest possible date.

FAGG, Circuit Judge, dissenting.

Plaintiffs challenge the Secretary's refusal to implement the portion of the Special Disaster Payments Program (SDPP) authorizing but not requiring the Secretary to make emergency disaster payments available to farmers if each of three prerequisite conditions is first found to exist in a given situation. 7 U.S.C. § 1444d(b)(2)(D). Plaintiffs contend that in this case each of the necessary conditions is present and further that the Secretary's failure to act is arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A). The government, however, argues that the "abuse of discretion" standard of review has no application in this case because the Secretary's refusal to implement this program is committed to his discretion by law and is not subject to judicial review. *Id.* § 701(a)(2).

The court today rejects the government's position and concludes the "[SDPP] presents a straightforward case which compels judicial review of agency inaction." *Ante* at 351. Having so concluded, the court requires the Secretary to adopt "procedural and substantive standards under which disaster assistance can be disbursed," *id.* at 351, and by implication requires the Secretary to implement the payments program and make emergency disaster payments available. I believe the court's decision is contrary to the controlling legal standard and impermissibly diminishes the discretion granted the Secretary by law.

As a general rule, the Administrative Procedures Act provides individuals with the right to seek judicial review of adverse agency action. 5 U.S.C. § 702. This general rule is not without exception, however. One narrow exception is contained in 5 U.S.C. § 701(a)(2) which exempts from judicial review those decisions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

The Supreme Court first examined the scope of this exception in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), in which the Court concluded the exception "is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is *no law to apply.*' " *Id.* at 410, 91 S.Ct. at 821 (emphasis added) (citation omitted). Recently, in *Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Court clarified the test to be applied in determining when agency action is committed by law to agency discretion or, in other words, when there is no law to apply. The Court stated:

> [The narrow exception of § 701(a)(2) is applicable and] review is not to be had if the statute is drawn so that a court would have no *meaningful standard* against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment *absolutely.* This construction avoids conflict with the "abuse of discretion" standard of review in § 706—if no *judicially manageable* standards are available for judging how and when an agency *should* exercise its discretion then it is impossible to evaluate agency action for "abuse of discretion."

*Id.,* 105 S.Ct. at 1655 (emphasis added). Applying this standard to the present action, I conclude that no judicially manageable standards exist against which to judge the Secretary's action, and thus the Secretary's action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

In establishing the SDPP, Congress' primary goal was to "provide for a limited continuation of disaster payments to cover those parts of the country into which Federal crop insurance has yet to expand." S.Rep. No. 126, 97th Cong. 1st Sess. 76, *reprinted in* 1981 U.S.Code Cong. & Ad. News 1965, 2041. To accomplish this goal, Congress provided that when natural disaster prevents the planting or harvesting of feed grains but Federal crop insurance is not yet available, the Secretary *"shall"* make disaster payments to eligible farmers. 7 U.S.C. § 1444d(b)(2)(A)–(C) (emphasis added). These provisions of the SDPP require the Secretary to administer a reasonably well-defined relief program, implemented and placed in effect by Congress. In essence, little is left to the Secretary's discretion.

The remaining provision of the SDPP, *id.* § 1444d(b)(2)(D), stands in sharp contrast to the subsections just discussed. This provision authorizes the Secretary to implement a disaster payments program in situations when crop insurance *is* available. However, unlike those portions of the SDPP that compel the Secretary to make payments when no insurance is available, this provision simply authorizes the Secretary to implement a payments program and provides that "the Secretary *may* make disaster payments * * * whenever [he] determines that—

> (i) as the result of drought, flood, or other natural disaster, or other condition beyond the control of the producers, producers on a farm have suffered substantial losses of production either from being prevented from planting feed grains or other nonconserving crop or from reduced yields, and that such losses have created an economic emergency for the producers;

> (ii) Federal crop insurance indemnity payments and other forms of assistance made available by the Federal Government to such producers for such losses are insufficient to alleviate such economic emergency, or no crop insurance cover-

ed the loss because of transitional problems attendant to the Federal crop insurance program; and

(iii) additional assistance must be made available to such producers to alleviate the economic emergency.

*Id.* (emphasis added).

The court relies on these factors, which by implication incorporate the factors mentioned in the legislative history of the SDPP, *see* S.Rep. No. 126, 97th Cong. 1st Sess. 78, *reprinted in* 1981 U.S.Code Cong. & Ad.News 1965, 2043 (comments of Senator Heflin), to find that judicially manageable standards exist against which the Secretary's decision can be judged. In so doing, I believe the court not only fundamentally misunderstands the limiting effect these criteria have on the Secretary, but also misapplies the controlling legal standard recently articulated by the Supreme Court in *Chaney,* 105 S.Ct. at 1655.

Rather than providing any meaningful standards against which the reasonableness of the Secretary's decision can be judged, these criteria only establish the threshold at which the Secretary has discretion to act and can implement a disaster payments program if he chooses to do so. Absent any one of these factors, the Secretary is without discretion; he can take no action. However, once these criteria are established, and in this case they apparently are, the Secretary is authorized to act. But, unlike the prior provisions, 7 U.S.C. § 1444d(b)(2)(A)–(C), in this instance Congress has seen fit only to provide that the Secretary *"may"* take action if he chooses to do so. *See id.* § 1444d(b)(2)(D). Thus, the Secretary's decision to act or not act is committed to his discretion.

Under *Chaney,* the issue then becomes whether standards exist under which this court can determine whether the Secretary's refusal to act constitutes an abuse of this discretion. *See* 5 U.S.C. § 706(2)(A). Such a determination requires this court to find judicially manageable, congressionally implicated standards that indicate those sit-

uations in which Congress intended that the Secretary *should* (rather than could) exercise his discretion. *Chaney,* 105 S.Ct. at 1655. With respect to this issue, the SDPP and its legislative history provide no guidance. Here, the court effectively views the presence of the criteria under which the Secretary *may* take some action as also establishing that the Secretary *must* take some action. Such a conclusion ignores the plain language of the SDPP.

The court's reliance on the General Accounting Office report is also misplaced. As an initial matter, a report such as this has no binding effect on the Secretary and does not provide this court with law to apply in reviewing the propriety of the Secretary's action. Further, this memo specifically assumes that the Secretary has decided to implement the program in a particular situation and only suggests that the Secretary adopt uniform criteria in determining what specific areas will be eligible to receive payments. Here, the Secretary has determined that the program as a whole will not be implemented. Such a decision is, in my opinion, within the Secretary's discretion, and as such the General Accounting Office report is irrelevant and of no significance in judging the appropriateness of this decision.

As an additional matter, I believe the prior Eighth Circuit decision in *Allison v. Block,* 723 F.2d 631 (8th Cir.1983), is inapplicable in this case. In *Allison,* Congress gave the Secretary no discretion with respect to developing a loan deferral program. *Id.* at 635. Rather, the only decision left to the Secretary was in determining whether individual loans would or would not be deferred. *Id.* In the present action, Congress has committed to the Secretary not only the decision of whether to make certain disaster payments to individuals in specific cases, but has also committed to the Secretary the decision of whether to implement the program under any circumstances. Had the Secretary determined that the program should be implemented

**358**

and then refused to promulgate procedures governing general entitlement to the payments being provided, a different question would be presented, and under those circumstances, *Allison* would be applicable.

I conclude that Congress has placed the determination of whether to implement the discretionary program encompassed in the SDPP entirely with the Secretary. While criteria exist which unless established prevent the Secretary from exercising any discretion, once these criteria have been established, there are no guidelines against which the Secretary's decision to act or not act can be judged. Because no judicially manageable standards exist, no law exists which can be applied to this case and judicial review is not appropriate.

As a final comment, I disagree with the court's cursory discussion of the anti-injunction provision found in 15 U.S.C. § 714b(c), which provides "no * * * injunction * * *, mesne or final, shall be issued against the [Commodity Credit] Corporation [(CCC)] or its property." 15 U.S.C. § 714b(c). In this action, plaintiffs seek a "preliminary injunction to compel * * * [the] Secretary * * * to implement three federal agricultural disaster relief programs." *Ante* at 348. Because the SDPP is administered by the Secretary through the CCC, 7 U.S.C. § 1444d(h), this court is without authority to grant plaintiffs the relief they request, and the action should be dismissed.

Further, although implying that its decision is not injunctive in nature, the court effectively enjoins the Secretary (and thus the CCC) and compels him to make available a program the implementation of which has been left entirely within his discretion. This result is contrary not only to the intent of Congress in adopting the SDPP, but is also contrary to the Administrative Procedures Act, recent Supreme Court authority, and the provisions of the Commodity Credit Corporation Act.

For the above stated reasons, I would affirm the decision of the district court.