State of NEBRASKA, by and through, Jon C. BRUNING, Attorney General of the State of Nebraska, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Kathleen Sebelius, in her official capacity as the Secretary of the United States Department of Health and Human Services, et al., Defendants.

No. 4:12CV3035.

United States District Court, D. Nebraska.

July 17, 2012.

David D. Cookson, Katherine J. Spohn, Attorney General's Office, Rocky C. Weber, Crosby, Guenzel Law Firm, Donald G. Blankenau, Blankenau, Wilmoth Law Firm, Lincoln, NE, for Plaintiffs.

Jon C. Bruning, Lincoln, NE, pro se.

Michelle R. Bennett, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

WARREN K. URBOM, Senior District Judge.

On February 23, 2012, the plaintiffs State of Nebraska, by and through Jon Bruning, Attorney General of the State of Nebraska (Nebraska); State of South Carolina, by and through Alan Wilson, Attorney General of the State of South Carolina (South Carolina); Bill Schuette, Attorney General of the State of Michigan, on behalf of the People of Michigan (Schuette); State of Texas, by and through Greg Abbott, Attorney General of the State of Texas (Texas); State of Florida, by and through Pam Bondi, Attorney General of the State of Florida (Florida); State of Ohio, by and through Michael DeWine, Attorney General of the State of Ohio (Ohio); State of Oklahoma, by and through Scott Pruitt, Attorney General of the State of Oklahoma (Oklahoma); Sister Mary

Catherine, CK (Sister Mary Catherine); Stacy Molai (Molai); Catholic Social Services; Pius X Catholic High School (Pius X); and the Catholic Mutual Relief Society of America (Catholic Mutual) filed a five-count complaint against the defendants United States Department of Health and Human Services (HHS); Kathleen Sebelius (Sebelius), in her official capacity as the Secretary of HHS; United States Department of the Treasury (Treasury); Timothy F. Geithner (Geithner), in his official capacity as the Secretary of the Treasury; United States Department of Labor (DOL); and Hilda L. Solis (Solis), in her official capacity as Secretary of the DOL. (*See* Compl., ECF No. 1.) Now before me is the defendants' motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* Defs.' Mot. to Dismiss, ECF No. 30). For the following reasons, the defendants' motion will be granted.

## I. BACKGROUND

### A. The Parties

The plaintiffs Nebraska, South Carolina, Texas, Florida, Ohio, and Oklahoma are sovereign states in the United States of America. (*See* Compl. ¶¶ 9–10, 12–15, ECF No. 1.) The plaintiff Schuette appears in this action for the people of Michigan. (*See id.* ¶ 11.) Collectively, these seven plaintiffs will be referred to as "the State plaintiffs."

The plaintiff Sister Mary Catherine is a Catholic nun affiliated with the School Sisters of Christ the King, which is a Catholic Order located in Lincoln, Nebraska. (Compl. ¶ 16, ECF No. 1.) The plaintiff Molai is a Catholic individual residing in Omaha, Nebraska, and a missionary employed by the Fellowship of Catholic University Students (FOCUS), which is "a Catholic organization engaged in ministry and outreach on college campuses throughout the United States and around the world." (*Id.* ¶¶ 22–23.) Collectively, these two plaintiffs will be referred to as "the individual plaintiffs."

The plaintiff Catholic Social Services is "a Nebraska non-profit corporation," "a faith-based charity services provider," and "a Catholic religious organization employer." (Compl. ¶ 34, ECF No. 1.) It "is an affiliated entity of the Catholic Diocese of Lincoln, Nebraska[,] providing social charity to persons in southern Nebraska." (*Id.* ¶ 35.) The plaintiff Pius X "is a Nebraska non-profit corporation and is the sole Catholic high school for the City of Lincoln and the Diocese of Lincoln, Nebraska." (*Id.* ¶ 44.) The plaintiff Catholic Mutual "is a non-profit religious 501(c)(3) organization with its princip[al] place of business located in Omaha, Nebraska." (*Id.* ¶ 51.) Collectively, these three plaintiffs will be referred to as "the organizational plaintiffs."

The defendants HHS, Treasury, and DOL (collectively, "the Departments") are agencies of the United States, and as noted previously, the defendants Sebelius, Geithner, and Solis are sued in their official capacities as the secretaries of those agencies. (Compl. ¶¶ 63–68, ECF No. 1.)

### B. The Relevant Statutes and Regulations

The plaintiffs allege that certain "final rules" that were adopted by the defendants in order to implement the Patient Protection and Affordable Care Act, Pub.L. No. 111–148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub.L. No. 111–152, 124 Stat. 1029 (2010) (collectively, the Affordable Care Act or ACA), will "coerce" religious individuals, "organizations, institutions, care providers, outreach groups, and social service agencies, among others, to directly subsidize contraception, abortifacients, sterilization, and related services in contravention [of] their religious beliefs." (Compl. ¶ 1, ECF No.

1; *see also* id. ¶ 69.) They add that "Plaintiff States' budgetary stability" will be threatened if "religious organization employers were to cease [to provide] health insurance in order to avoid the requirements of the Rule." (*Id.* ¶¶ 85–86.) A review of the relevant statutes, regulations, and rules is in order.

Section 1001 of the ACA added section 2713 to the Public Health Service Act (PHS Act). *See* 42 U.S.C. § 300gg–13. In pertinent part, PHS Act section 2713, which is titled "coverage of preventive health services," states,

(a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—

(1) evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force; [and]

. . . .

(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

42 U.S.C. § 300gg–13(a)(1), (4).

On July 19, 2010, the Departments issued interim final regulations implementing section 2713. *See* Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed.Reg. 41726 (July 19, 2010). The interim final regulations state that when new recommendations or guidelines for preventive health services are issued, coverage for those services "must be provided for plan years (in the individual market, policy years) beginning . . . one year after the date the recommendation or guideline is issued." 75 Fed.Reg. 41726, 41729. They also state, "The requirements to cover recommended preventive services without any cost-sharing requirements do not apply to grandfathered health plans." *Id.* (citing 26 C.F.R. § 54.9815–1251T; 29 C.F.R. 2590.715–1251; 45 C.F.R. § 147.140). Grandfathered health plans are defined as plans "in which an individual was enrolled on March 23, 2010," and which are able to comply with certain regulations. *See* 26 C.F.R. § 54.9815–1251T; 29 C.F.R. 2590.715–1251; 45 C.F.R. § 147.140.

On August 1, 2011, the Health Resources and Services Administration (HRSA) adopted recommendations for preventive services for women that include certain services related to contraception. (*See* Defs.' Br. at 7, ECF No. 31 (citing HRSA Guidelines, *available at* http://www.hrsa.gov/womensguide lines/).) The Departments then published amendments to the interim final regulations that took effect on that same date (*i.e.,* August 1, 2011). *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed.Reg. 46621 (Aug. 3, 2011). The amendments to the interim final regulations note,

[The interim final regulations state that], to the extent not described in the U.S. Preventive Services Task Force recommendations, HRSA was charged with developing comprehensive guidelines for preventive care and screenings with respect to women. . . . The interim final regulations also require that changes in the required items and services be implemented no later than plan years (in the individual market, policy years) beginning on or after the date that is one year from when the new recommendation or guideline is issued.

In response to the request for comments on the interim final regulations, the Departments received considerable feedback regarding which preventive services for women should be considered for coverage under PHS Act section 2713(a)(4). Most commenters, including some religious organizations, recommended that HRSA Guidelines include contraceptive services for all women and that this requirement be binding on all group health plans and health insurance issuers with no religious exemption. However, several commenters asserted that requiring group health plans sponsored by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom. One commenter noted that some religious employers do not currently cover such benefits under their group health plan due to their religious beliefs.

... These HRSA Guidelines exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women. In the Departments' view, it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate. Specifically, the Departments seek to

provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions....

In light of the above, the Departments are amending the interim final rules to provide HRSA additional discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned. The amendment to the interim final rules provides HRSA with the discretion to establish this exemption. Consistent with most States that have such exemptions, as described below, the amended regulations specify that, for purposes of this policy, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) refer to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order
....

76 Fed.Reg. 46621, 46623. *See also* 45 C.F.R. § 147.130(a)(1)(iv). (*See also* Compl. ¶ 78, ECF No. 1 (describing the scope of the religious employer exemption).) In short, the amended interim final regulations require non-grandfathered plans that do not fall within the exemption for "religious employers"[1] to provide cov-

---

1. I note in passing that although the amended interim final regulations state merely that they grant HRSA discretion to exempt "religious employers" from the guidelines regarding contraceptive services, later rules indicate that HRSA did, in fact, exercise this discretion in the guidelines published on August 1, 2011. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protec-

tion and Affordable Care Act, 77 Fed.Reg. 8725, 8726 (Feb. 15, 2012) ("In the HRSA Guidelines, HRSA exercised its discretion under the amended interim final regulations such that group health plans established and maintained by these religious employers (and any group health insurance coverage provided in connection with such plans) are not required to cover contraceptive services.").

erage for the contraceptive services recommended by HRSA "for plan years (in the individual market, policy years) beginning on or after the date that is one year from when the new [contraceptive services] recommendation or guideline [was] issued," *i.e.*, August 1, 2012.

On February 15, 2012, the Departments published rules that "finalize[d], without change," the amended interim final regulations discussed above. Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed.Reg. 8725 (Feb. 15, 2012). In their complaint, the plaintiffs refer to these rules as "the Rule" (*e.g.*, Compl. ¶ 69, ECF No. 1); I shall do so as well.[2] The Rule states,

> Section 2713 of the PHS Act, as added by the Affordable Care Act[,] ... requires that non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screening provided for in the comprehensive guidelines supported by [HRSA] that were issued on August 1, 2011 (HRSA Guidelines). As relevant here, the HRSA Guidelines require coverage, without cost sharing, for "[a]ll Food and Drug Administration ... approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a provider. Except as discussed below, non-grandfathered group health plans and health insurance issuers are required to provide coverage consistent with the HRSA Guidelines, without cost

sharing, in plan years (or, in the individual market, policy years) beginning on or after August 1, 2012. ...

77 Fed.Reg. 8725, 8725–8726 (footnotes omitted). After reviewing the definition of "religious employer" quoted above, *see, e.g.*, 76 Fed.Reg. 46621, 46623, and noting that the HRSA exercised its discretion to exempt "religious employers" from the contraceptive services coverage requirement, (*see* note 1, *supra*), the Rule summarizes comments that the Departments received about the amended interim final regulations, *see* 77 Fed.Reg. 8725, 8726–8727. The Rule continues,

> In response to these comments, the Departments carefully considered whether to eliminate the religious employer exception or to adopt an alternative definition of religious employer, including whether the exemption should be extended to a broader set of religiously-affiliated sponsors of group health plans and group health insurance coverage. For the reasons discussed below, the Departments are adopting the definition in the amended interim final regulations for purposes of these final regulations while also creating a temporary enforcement safe harbor, discussed below. During the temporary enforcement safe harbor, the Departments plan to develop and propose changes to these final regulations that would meet two goals-providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services. ...

77 Fed.Reg. 8725, 8727.

When the Rule was posted, HSS issued a bulletin that established the aforementioned "temporary enforcement safe har-

---

**2.** In their brief in response to the defendants' motion to dismiss, the plaintiffs refer to the

Rule as "the Final Rule." (Pls.' Response Br. at 1, ECF No. 33.)

bor." *See* Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. 16501, 16502 (Mar. 21, 2012) (citing HHS, *Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code* (Feb. 10, 2012) (hereafter "the Bulletin") *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210–Preventive–Services–Bulletin.pdf). (*See also* Compl. ¶ 71, ECF No. 1.) "The bulletin confirmed that all three Departments will not take any enforcement action against an employer, group health plan, or health insurance issuer that complies with the conditions of the temporary enforcement safe harbor described in the bulletin." 77 Fed.Reg. 16501, 16503. Generally, the temporary enforcement safe harbor applies to "group health plans sponsored by non-profit organizations that, on and after February 10, 2012, do not provide some or all of the contraceptive coverage otherwise required, consistent with any applicable State law, because of the religious beliefs of the organization (and any group health insurance coverage provided in connection with such plans)." 77 Fed.Reg. 16501, 16502–16503.[3] Also, the temporary enforcement safe harbor "is in effect until the first plan year that begins on or after August 1, 2013." 77 Fed.Reg. 16501, 16503.

The Rule also states,

Before the end of the temporary enforcement safe harbor, the Departments will work with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing with respect to non-exempted, non-profit religious organizations with religious objections to such coverage. Specifically, the Departments plan to initiate a rulemaking to require issuers to offer insurance without contraception coverage to such an employer (or plan sponsor) and simultaneously to offer contraceptive coverage directly to the employer's plan participants (and their beneficiaries) who desire it, with no cost-sharing.... The Departments intend to develop policies to achieve the same goals for self-insured group health plans sponsored by non-exempted, non-profit religious organizations with religious objections to contraceptive coverage.

77 Fed.Reg. 8725, 8728.

On March 21, 2012, the Departments published an "advance notice of proposed

---

**3.** More specifically, the bulletin extends the safe harbor to "employers," "group health plans," and "group health insurance issuers" that "fail[ ] to cover recommended contraceptive services without cost sharing in non-exempted, non-grandfathered group health plans established or maintained by an organization" and that meet all of the following criteria:

1. The organization is organized and operates as a non-profit entity.
2. From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.
3. As detailed below, the group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide to participants the attached notice, as described below, which states that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.
4. The organization self-certifies that it satisfies criteria 1–3 above, and documents its self-certification in accordance with the procedures detailed herein.

Bulletin at 3 (footnote omitted).

rulemaking" (ANPRM). 77 Fed.Reg. 16501. The ANPRM announces the intention of the Departments to propose amendments that "would establish alternative ways to fulfill the requirements of section 2713 of the Public Health Service Act and companion provisions ... when health coverage is sponsored or arranged by a religious organization that objects to the coverage of contraceptive services for religious reasons and that is not exempt under the final regulations published February 15, 2012 [ (i.e., the Rule) ]." 77 Fed. Reg. 16501. The ANPRM notes that one of the Departments' goals is "to protect ... religious organizations from having to contract, arrange, or pay for contraceptive coverage," while also maintaining contraceptive coverage without cost sharing for individuals who receive coverage through those organizations. 77 Fed.Reg. 16501, 16503. It then suggests "multiple options" for achieving these goals, and it states that "[t]he Departments seek input on these options ... as well as new ideas to inform the next stage of the rulemaking process." *Id. See also* 77 Fed.Reg. 16501, 16504–16508. In short, the ANPRM is "the first step toward promulgating ... amended final regulations" prior to the end of the temporary enforcement safe harbor that will "accommodat[e] non-exempt, non-profit religious organizations' religious objections to covering contraceptive services and assur[e] that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing." 77 Fed.Reg. 16501, 16503. It provides "an early opportunity for any interested stakeholder to provide advice and input into the policy development relating to the accommodation to be made" to organizations with religious objections to contraceptive coverage. *Id.* Also, the ANPRM states, "Following the receipt of public comment, a notice of proposed rulemaking (NPRM) will be published, which will permit additional public comment, followed by amended final regulations." *Id.*

## C. The Plaintiffs' Allegations

As noted above, the plaintiffs allege generally that the Rule "would coerce religious organizations, institutions, care providers, outreach groups, and social services agencies, among others, to directly subsidize contraception, abortifacients, sterilization, and related services in contravention [of] their religious beliefs." (Compl. ¶ 1, ECF No. 1.) They add that "[t]he Rule was definitively and formally promulgated by publication in the Federal Register as a 'Final Rule,'" and "there is no hint that the Rule is informal, tentative, ... [or] only the ruling of a subordinate official, or that full compliance with the Rule is not expected." (*Id.* ¶ 70 (citation omitted).) Furthermore, they allege that they are each at risk for irreparable injury, "[n]otwithstanding [their] ability or inability to qualify for" the temporary enforcement safe harbor, because "[n]o discernable statutory or regulatory obstacle exists barring the Federal Government from unilaterally withdrawing its promise of" the safe harbor, and because the "[p]laintiffs will absolutely be required to comply upon the expiration of the safe harbor on August 1, 2013." (*Id.* ¶¶ 73–74 (emphasis omitted).)

The specific injuries allegedly faced by each of the plaintiffs merit further discussion. First, the plaintiffs allege that Sister Mary Catherine is covered by a health insurance plan "through the Catholic Diocese of Lincoln, Nebraska," that "has been specifically contracted for to exclude coverage for purposes of contraception, abortifacients, sterilization, and related services"; that her health insurance plan "is not grandfathered from ACA requirements"; that "[h]ealth [i]nsurance coverage of ... contraception, abortifacients, or sterilization [contravenes her] religious beliefs"; and that she "will drop her private health

insurance coverage if retaining such coverage would result in the subsidization of contraception, abortifacients, sterilization, and related services." (Compl. ¶¶ 17–21, ECF No. 1. *See also id.* ¶¶ 75–76 (alleging, *inter alia,* that Sister Mary Catherine "will be forced to pay civil penalties and forego health insurance altogether").)

Similarly, the plaintiffs allege that Molai is "covered by a health insurance plan" that "has been specifically contracted for to exclude coverage for purposes of contraception, abortifacients, sterilization, and related services"—all of which contravene Molai's religious beliefs—and that Molai will "drop [health] coverage if it would result in her subsidization" of those services. (*Id.* ¶¶ 24–26, 30, 75.) In addition, the plaintiffs allege that "Molai suffers from an incurable chronic illness which requires substantial ongoing care" and "occasionally necessitates hospitalization and surgery," and therefore "[h]ealth insurance coverage is critical to Molai in order to avoid financial ruin and possibly life threatening consequences." (*Id.* ¶¶ 27–30.) Unlike Sister Mary Catherine's plan, "Molai's current health insurance plan is grandfathered from ACA requirements." (*Id.* ¶ 31 (emphasis omitted).) The plaintiffs allege, however, that "[u]pon [such] time Molai or her employer . . . substantially changes any aspect of Molai's health insurance plan, Molai's plan will immediately become subject to ACA requirements and the contraceptive coverage Rule promulgated pursuant thereto." (*Id.* ¶ 32. *See also* id. ¶ 33 ("Since the ACA's grandfathering exemption does not apply to health insurance plans which substantially change after March 23, 2010, Molai is trapped in her current plan if she wishes to remain grandfathered from ACA requirements."); *id.* ¶¶ 88–89.)

The plaintiffs allege that Catholic Social Services "has more than 50 persons on staff," and its "purpose is to serve persons of all religious and ethnic backgrounds." (Compl. ¶¶ 36–37, ECF No. 1.) "Though Catholic Social Services exists and conducts its ministry pursuant to a religiously-rooted sense of purpose, mission, and duty, its primary operational purpose is not the inculcation of religious values." (*Id.* ¶ 38.) "Catholic Social Services is covered by a health insurance plan" that "has been specifically contracted for to exclude coverage for purposes of contraception, abortifacients, sterilization, and related services," all of which contravene "Catholic teaching and doctrine adhered to . . . by Catholic Social Services." (*Id.* ¶¶ 39–41.) The plaintiffs allege that "Catholic Social Services' current health insurance plan is not grandfathered from ACA requirements," and that Catholic Social Services will drop its plan if retaining it "would result in the subsidization of" the aforementioned services. (*Id.* ¶¶ 42–43 (emphasis omitted).)

Pius X, which "employs more than 70 faculty and staff," "is dedicated to [providing] a Christ-centered education that integrates Catholic values in all areas of life and [to] providing academic preparation of the highest quality in a disciplined environment." (Compl. ¶¶ 45–46, ECF No. 1.) The plaintiffs allege that Pius X, like Catholic Social Services, "is covered by" a nongrandfathered health insurance plan that excludes coverage for contraception, abortifacients, sterilization, and related services, all of which contravene "Catholic teaching and doctrine adhered to . . . by Pius X." (*Id.* ¶¶ 47–50.)

"Catholic Mutual provides health coverage to its employees through a group health plan" that "is currently grandfathered from ACA's requirements." (Compl. ¶¶ 52, 59, ECF No. 1.) The plaintiffs allege, however, that "Catholic Mutual comprehensively evaluates its employee health plan on an annual basis," and "[i]f

Catholic Mutual substantially changes certain aspects of its employee health insurance plan, [it] will immediately become subject to ACA requirements and the contraceptive coverage Rule." (*Id.* ¶¶ 61–62. *See also id.* ¶ 60 (alleging that "Catholic Mutual is trapped in its current plan if it wishes to remain grandfathered from ACA requirements").) Catholic Mutual "does not primarily employ persons who share [its] religious tenets," and it "does not inquire as to the religious affiliation or beliefs of prospective employees." (*Id.* ¶¶ 53–54.) Furthermore, "[a]lthough Catholic Mutual exists and conducts its operations pursuant to a religious-rooted sense of purpose, mission, and duty," the plaintiffs allege that "Catholic Mutual's primary operational purpose is not the inculcation of religious values." (*Id.* ¶ 55.) "Coverage of services for purposes of contraception, abortifacients, or sterilization" contravenes "Catholic teaching and doctrine adhered to ... by Catholic Mutual"; thus, it "does not include coverage of [those] services ... in its employees' health insurance plans," and its "employees are not offered supplemental insurance plans to cover [those services] ... in connection with their primary employer-subsidized health care plans." (*Id.* ¶¶ 56–58.)

The plaintiffs allege that the Rule encroaches "on the liberty of the religious organization employers ... by mandating that [they] subsidize coverage for contraceptives, sterilization, and related patient education and counseling." (Compl. ¶ 77, ECF No. 1.) They add that in the event that the organizational plaintiffs' health insurance plans "are no longer grandfathered plans," there are "two ways in which [they] can circumvent the Rule's requirements: declining to provide health insurance altogether and fac[ing] a stiff per-employee penalty[,] or satisfying all of the criteria to qualify for a 'religious employer' exemption." (*Id.* ¶ 82.) The plaintiffs allege that the organizational plaintiffs

"are not eligible for the ... narrow religious employer exemption to the Rule, based on the Federal Government's stated intent to exclude hospitals, schools, and universities and because [the p]laintiffs do not clearly satisfy all of the exemptions rigid conjunctive requirements." (*Id.* ¶ 83.) They also claim that the Rule's religious employer exemption will not cover the organizational plaintiffs unless "Catholic Social Services, Pius X Catholic High School, and Catholic Mutual ... begin inquiring into the religious affiliation and beliefs of prospective employees-a practice in which Catholic Social Services and Catholic Mutual currently do not engage." (*Id.* ¶ 79.) In addition, the plaintiffs allege that Pius X has "enjoyed the certainty of broad religious employer exemptions" in other contexts, but "[d]ue to the insufficiently narrow nature of the religious employer exemption to the Rule," Pius X "face[s] great uncertainty in determining whether [it] will enjoy the same religious employer exemptions from government mandates as they have in the past." (*Id.* ¶¶ 80–81.)

According to the complaint, the State plaintiffs will be injured by the Rule in the following ways. First, the plaintiffs allege that because the Rule offends the religious beliefs of "religious organization employers," those employers "may simply cease [to provide] health insurance coverage to their employees ... rather than subsidize conduct and services in violation of their beliefs." (Compl. ¶ 84, ECF No. 1.) Then, "[i]f religious employers were to cease [to provide] health insurance in order to avoid the requirements of the Rule, an immediate and substantial spike in the number of enrollments in Plaintiff States' Medicaid programs would result, as many impacted employees would invariably shift to Medicaid to remain in compliance with the ACA's individual coverage mandate." (*Id.* ¶ 85.) The plaintiffs add that the State

plaintiffs' "Medicaid programs are already facing the acute strain of dramatically increased enrollments due to the ACA's individual coverage mandate," and "[f]orcing another round of enrollments will compound this problem and further threaten Plaintiff States' budgetary stability." (*Id.* ¶ 86.) "In addition, religious organization employers operating in Plaintiff[ ] States will cease providing charitable services to persons who do not share their religious tenets, in an effort to qualify under the Religious Employer Exemption. Those people no longer served by such charitable services will place further pressure on Plaintiff States' Medicaid programs as they inevitably increase reliance on public resources for support." (*Id.* ¶ 87.)

In Count I of their complaint, the plaintiffs allege that the Rule violates the Free Speech Clause of the First Amendment to the United States Constitution because it compels them to "subsidize" beliefs and conduct that violate their moral and religious beliefs, and because it prohibits them "from expressing a message in accordance with their beliefs." (Compl. ¶¶ 91–94, ECF No. 1.) In Count II, the plaintiffs allege that the Rule violates the First Amendment's Free Exercise Clause "by negating the right of Plaintiffs to act in accordance with their beliefs." (*Id.* ¶ 96.) They add that the Rule "imposes a substantial burden on Plaintiffs' religious exercise," "coerces Plaintiffs to change or violate their religious beliefs," "chills Plaintiffs' religious exercise," "exposes Plaintiffs to substantial fines for [their] religious exercise," and negates "the right of Plaintiffs to freely practice their religious beliefs without government interference." (*Id.* ¶¶ 100–104. *See also id.* ¶¶ 95, 97–99 (alleging that "[t]he Rule furthers no compelling governmental interest" and "is not the least restrictive means of furthering Defendants' stated interests").) In Count III, the plaintiffs allege that the Rule violates the First Amendment's Freedom of Association Clause because it "negat[es] the rights of Plaintiffs to organize voluntary religious associations by forcing Plaintiffs to associate with an ideology that violates their religious beliefs" and "negat[es] the rights of Plaintiffs to organize voluntary religious associations that serve persons of other beliefs." (*Id.* ¶¶ 105–107.) In Count IV, the plaintiffs allege that "[t]he Rule works a substantial burden on the Plaintiffs' ability to freely practice their religion" in violation of the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.* (Compl. ¶ 109, ECF No. 1. *See also id.* ¶¶ 108, 110–117 (alleging that the Rule "chills Plaintiffs' religious exercise," "exposes Plaintiffs to substantial fines for its [sic] religious exercise," "furthers no compelling governmental interest and is not narrowly tailored to any compelling governmental interest," "is not the least restrictive means of furthering Defendants' stated interests," "puts substantial pressure on religious adherents to modify religious beliefs and behavior in order to comply with the Rule's mandates," and "is a substantial burden on the rights of Plaintiffs to freely exercise religion because it forces them to subsidize contraceptives in violation of their religious beliefs"; that the Rule's exception for religious employers "violates RFRA because [it] would require the government to troll through an organization's religious beliefs to determine whether the organization is religious enough to be exempt from the Rule's dictates," and that "[t]he Rule's compulsory funding of contraceptives is a substantial burden upon the Plaintiffs because it impermissibly interferes in matters of church faith and doctrine").) In Count V, the plaintiffs allege that they are entitled to relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, because "[t]here is an actual controversy of sufficient immediacy and concreteness relating to the le-

gal rights and duties of the Plaintiffs and their legal relations with the Defendants," and "[t]he harm to the Plaintiffs as a direct result of the Rule is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties." (Compl. ¶¶ 118–120, ECF No. 1.)

Based on all of the foregoing allegations, the plaintiffs seek a declaration that the Rule violates the First Amendment, RFRA, and "the Plaintiffs' constitutional rights"; an order that 1) enjoins the defendants "and any other agency or employee acting on behalf of the United States from enforcing the Rule against the Plaintiffs, their citizens and residents, and any of their agencies or officials or employees" and 2) requires the defendants "to take such actions as are necessary and proper to remedy their violations"; and an award of reasonable attorney's fees and costs. (*See* Compl. at 21–22, 23, ECF No. 1.)

## II. STANDARD OF REVIEW

### A. Rule 12(b)(6)

"Federal Rule of Civil Procedure 8 requires that a complaint present 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir.2009). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). It is important to note, however, that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

action will not do.'" *Id.* (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955) (internal quotation marks omitted). In other words, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)) (brackets omitted).

### B. Rule 12(b)(1) and Standing

A plaintiff's standing to sue "is the threshold question in every federal case" because it determines "the power of the court to entertain the suit." *McClain v. American Economy Ins. Co.,* 424 F.3d 728, 731 (8th Cir.2005) (quoting *Steger v. Franco, Inc.,* 228 F.3d 889, 892 (8th Cir.2000)). The concept of standing is rooted in Article III, § 2, of the United States Constitution, "which limits the subject matter jurisdiction of federal courts to actual cases and controversies." *Id.* Thus, if standing is lacking, then this court has no subject matter jurisdiction. *E.g., Gray v. City of Valley Park, Mo.,* 567 F.3d 976, 980 (8th

Cir.2009) (quoting *Young America Corp. v. Affiliated Computer Services (ACS), Inc.,* 424 F.3d 840, 843 (8th Cir.2005)). *See also Faibisch v. University of Minnesota,* 304 F.3d 797, 801 (8th Cir.2002) ("[A] standing argument implicates Rule 12(b)(1).").[4]

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may challenge either the factual truthfulness or the facial sufficiency of the plaintiff's jurisdictional allegations. *See, e.g., Stalley v. Catholic Health Initiatives,* 509 F.3d 517, 520–21 (8th Cir.2007) (citing *Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990)). In a facial attack, the standard of review is the same standard that applies to motions brought pursuant to Federal Rule of Civil Procedure 12(b)(6), and which I have outlined above: I must "accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law," and I must determine whether the plaintiff has asserted "facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *Stalley,* 509 F.3d at 521 (citing, *inter alia, Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In contrast, "[w]hen a district court engages in a factual review, it inquires into and resolves factual disputes." *Faibisch,* 304 F.3d at 801. *See also Titus v. Sullivan,* 4 F.3d 590, 593 & n. 1 (8th Cir.1993). In this case, the defendants have made a facial attack upon the plaintiffs' jurisdictional allegations, (*see* Defs.' Br. at 11, ECF No. 31), and their motion to dismiss will be analyzed accordingly.

4. As will be discussed below, some elements of the doctrine of standing "are prudential, involving self imposed limits on judicial power" that "may be 'modified or abrogated by Congress.'" *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 591 (8th Cir.2009) (quoting *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct.

## III. ANALYSIS

The defendants argue that the complaint must be dismissed because the plaintiffs lack standing and their claims are not ripe. (*See* Defs.'s Br. at 11–33, ECF No. 31.) The defendants add that the State plaintiffs' claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See id.* at 33–35.) I shall analyze each of the defendants' arguments in turn.

### A. Whether the Organizational Plaintiffs Lack Standing

The defendants argue first that the claims of the organizational plaintiffs (i.e., Catholic Social Services, Pius X, and Catholic Mutual) must be dismissed because those plaintiffs have not established that they have standing to sue. (Defs. Br. at 12–17, ECF No. 31.) I agree with the defendants.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *McClain v. American Economy Ins. Co.,* 424 F.3d 728, 731 (8th Cir.2005) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). "The purpose of the imminence requirement is 'to ensure that the alleged injury is not too speculative ... [and] that the injury is

1154, 137 L.Ed.2d 281 (1997)). "The heart of standing, however, is the principle that in order to invoke the power of a federal court, a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Id.*

certainly impending.'" *United States v. Metropolitan St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir.2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "The part[ies] invoking federal jurisdiction"—here, the plaintiffs—"bear[ ] the burden of establishing these elements." *Young America Corp.*, 424 F.3d at 843 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

The defendants claim that the organizational plaintiffs "fail[ed] to demonstrate a concrete and imminent injury resulting from the operation of the preventive service coverage regulations." (*Id.* at 13.) In support of this argument, the defendants submit that the organizational plaintiffs "have not made sufficient factual allegations to show that the group health plans they offer to their employees are not eligible for grandfather status." (*Id.*) [5]

■ Pius X and Catholic Social Services allege that their group health plans are not grandfathered. (*See* Compl. ¶¶ 43, 50, ECF No. 1; Pls.' Response Br. at 6–7, ECF No. 33.) Although the plaintiffs argue that this allegation "must be accepted as true," (Pls.' Response Br. at 25, ECF No. 33), a "naked assertion" that a plan does not satisfy the legal definition of "grandfathered health plans" is not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). As explained above, legal conclusions are not entitled to the benefit of "the tenet that a court must accept as true all of the allegations contained in a complaint." *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). To meet their burden, the plaintiffs must plead *facts* showing that the Pius X and Catholic Social Services plans are not grandfathered. *E.g., Metropolitan St. Louis Sewer Dist.*, 569 F.3d at 834 ("To demonstrate standing, a plaintiff must clearly allege facts showing an injury in fact...."). By way of example, if a plaintiff were to allege that its plan has not "continuously covered someone since March 23, 2010," that factual allegation would be entitled to deference, and it would render plausible the legal conclusion that the plan was not grandfathered. *See* 26 C.F.R. § 54.9815–1251T(a)(1)(i); 29 C.F.R. 2590.715–1251(a)(1)(i); 45 C.F.R. § 147.140(a)(1)(i). *See also* 26 C.F.R. § 54.9815–1251T(g)(1) ("Maintenance of grandfather status"); 29 C.F.R. 2590.715–1251(g)(1) (same); 45 C.F.R. § 147.140(g)(1) (same).[6] Here, however, the plaintiffs have failed to plead specific facts showing that the Pius X and Catholic Social Services plans are not grandfathered. As a result, they have not shown that they are subject to the Rule's contraceptive, sterilization, and related preven-

---

**5.** As noted previously, the preventive health service coverage regulations—including the Rule—do not apply to grandfathered plans. *See, e.g.,* 77 Fed.Reg. 8725; 75 Fed.Reg. 41726; 26 C.F.R. § 54.9815–1251T; 29 C.F.R. 2590.715–1251; 45 C.F.R. § 147.140. Thus, if a plan is grandfathered within the meaning of the regulations, it will not be required to provide coverage for contraceptive services.

**6.** As an alternate example, I note that the complaint alleges that Catholic Social Services does not limit "its provision of services

to person[s] who share its religious tenets," and "its primary operational purpose is not the inculcation of religious values." (Compl. ¶¶ 37–38, ECF No. 1.) These are factual allegations which must be taken as true, and they show that it is plausible that Catholic Mutual cannot satisfy the legal definition of "religious employer" for purposes of the Rule's exemption. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B)(1), (3) (stating that an organization is a "religious employer" if "[t]he inculcation of religious values is the purpose of the organization" and if it "serves primarily persons who share the religious tenets of the organization").

tive service coverage requirements, and I must dismiss their claims for lack of standing.

■ Catholic Mutual admits that its group health plan is grandfathered. (Defs.' Br. at 13, ECF No. 31 (citing Compl. ¶ 59, ECF No. 1).) The plaintiffs allege, however, that "Catholic Mutual is trapped in its current plan if it wishes to remain grandfathered from ACA requirements." (Compl. ¶ 60, ECF No. 1. *See also id.* ¶ 88.) They add, "Given that the Federal Government itself has conceded that employers and individuals will inevitably find it necessary to make substantial modifications to health insurance plans, particularly in light of spiraling costs and a fluctuating regulatory environment, it is readily apparent that currently-grandfathered Plaintiffs will lose their exemption from ACA requirements in the foreseeable future; it is unrealistic to presume they can remain grandfathered in perpetuity." (*Id.* ¶ 89.) Notably, the plaintiffs do not allege that Catholic Mutual intends to make—or is even contemplating—specific changes to its plan that would end its grandfathered status. Instead, the plaintiffs merely speculate and/or assume that Catholic Mutual will lose grandfathered status sometime in the future. This is insufficient to establish Catholic Mutual's standing to sue. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564 n. 2, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes. ... It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control.").

In a similar vein, the plaintiffs argue that substantial modifications to Catholic Mutual's grandfathered plan are "bound to occur" because projections indicate that "only 55% of large employer and 34% of small employer plans would remain grandfathered by 2013." (Pl.'s Response Br. at 7–8, ECF No. 33.) These projections do not avail the plaintiffs; indeed, I do not see that they are relevant. It is the plaintiffs' burden to allege facts showing that *they* lack (or will soon lose) grandfather status, and thereby establish that it is plausible that they will be subject to the requirements of the Rule. They have failed to do so, and references to data showing that many plans might lose grandfathered status by 2013 do not cure this failure.

The plaintiffs also argue that "the organizational ... Plaintiffs face an imminent decision to either compromise their religious beliefs or violate the law," and therefore they "have standing to pursue their claim." (Pls.' Response Br. at 5, ECF No. 33.) More specifically, they state that the organizational plaintiffs' "plans have been specifically contracted to exclude coverage for ... contraception, abortifacients, sterilization, and related services," and they "will be coerced into purchasing or subsidizing coverage in direct contravention of their beliefs or dropping coverage outright if the Final Rule is upheld." (*Id.* at 6.) This coercion, they argue, "constitutes an injury-in-fact." (*Id.*) Because the Rule does not apply to grandfathered plans, however, the organizational plaintiffs face no "coercion" (or any other imminent injury traceable to the Rule) unless their current plans are *not* grandfathered. The complaint does not allege facts showing that the organizational plaintiffs' plans are not grandfathered, and therefore those plaintiffs have not established their standing to sue.

I note in passing that the defendants have submitted an alternate argument in support of their position that the organizational plaintiffs lack standing. (*See* Defs.' Br. at 14–16, ECF No. 31.) Specifically, the defendants argue that "even if the organization[al] plaintiffs had sufficiently alleged that their group health plans are not grandfathered, they still would not have alleged an injury in fact" because the temporary enforcement safe harbor will protect them until August 1, 2013, and the Rule is "undergoing amendment" during the meantime. (See Defs.' Br. at 14, ECF No. 31; *see also id.* at 15–16.) It seems to me that this argument implicates the doctrine of ripeness more so than standing, and therefore I shall revisit it briefly in a later section of this memorandum.

## B. Whether the Individual Plaintiffs Lack Standing

█ The defendants argue that the individual plaintiffs (*i.e.*, Sister Mary Catherine and Molai) lack standing for the same reason that the organizational plaintiffs lack standing—i.e., they have failed to allege facts showing that "their current health plans, which do not offer contraception, are not grandfathered and thus excluded from the requirement to cover contraceptive services." (Defs.' Br. at 18, ECF No. 31.) Again, I agree with the defendants.

Sister Mary Catherine alleges that she "is covered by a health insurance plan with Blue Cross Blue Shield of Nebraska through the Catholic Diocese of Lincoln, Nebraska," and that this plan "is not grandfathered from ACA requirements." (Compl. ¶¶ 17, 21, ECF No. 1 (emphasis omitted).) As explained in Part III.A, the plaintiffs' allegation that Sister Mary Catherine's plan is not grandfathered cannot be accepted as true because it is a legal conclusion, and "[a] pleading that offers 'labels and conclusions' . . . will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiffs have not pleaded specific facts showing that Sister Mary Catherine's plan is not grandfathered, and therefore they have not shown that it is plausible that Sister Mary Catherine will be subject to the requirements of the Rule. Thus, she has not shown that she faces imminent injury, and her standing is not established.

Like Catholic Mutual, Molai admits that her health plan is grandfathered. (Compl. ¶ 31, ECF No. 1.) Also like Catholic Mutual, Molai alleges that she "is trapped in her current plan if she wishes to remain grandfathered from ACA requirements"; that her "plan will immediately become subject to ACA requirements and the contraceptive coverage Rule" when "her employer, FOCUS, substantially changes any aspect of" the plan; and "it is unrealistic to presume" that her plan "can remain grandfathered in perpetuity." (*Id.* ¶¶ 32–33, 89.) As explained in Part III.A above, however, speculation that Molai's plan may change "at some indefinite future time" is insufficient to establish her standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Furthermore, neither Sister Mary Catherine nor Molai have alleged facts indicating that their employers do not qualify for the Rule's religious employers exception. As noted previously, the Rule does not apply to a "religious employer," which is defined as an organization that meets the following criteria: (1) The inculcation of religious values is the purpose of the organization; (2) The organization primarily employs persons who share the religious tenets of the organization; (3) The organization serves primarily persons who share the religious tenets of the organization;

and (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B); Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed.Reg. 8725, 8726–27 (Feb. 15, 2012); Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed.Reg. 46621, 46623 (Aug. 3, 2011). The plaintiffs allege that the "Rule's religious employer exemption is insufficiently narrow [sic]" because "it fails to cover a significant number of organizations." (Compl. ¶ 78, ECF No. 1.) They also allege that Catholic Social Services and Catholic Mutual do not qualify for the exemption because they do not "inquir[e] into the religious affiliation and beliefs of prospective employees," and they allege that Pius X (and other plaintiffs) "are not eligible for the . . . religious employer exemption . . . based on the Federal Government's stated intent to exclude hospitals, schools, and universities." (*Id.* ¶¶ 79, 83.)[7] The plaintiffs allege no facts, however, showing that Sister Mary Catherine's employer (*i.e.*, either School Sisters of Christ the King or the Catholic Diocese of Lincoln, Nebraska) or Molai's employer (*i.e.*, FOCUS) do not qualify for the religious employer's exemption. Thus, for this additional reason, the plaintiffs have failed to establish that Sister Mary Catherine and Molai have standing to sue.

In short, the individual plaintiffs have not shown that their current health plans will be required to cover contraception-related services under the Rule, and therefore their claims must be dismissed for lack of standing.[8]

## C. Whether the State Plaintiffs Lack Standing

### 1. Article III Standing

■ The State plaintiffs allege that they have standing to sue in their own right[9] because, "[a]s a result of the Rule's compulsory violation of religious organization employers' religious beliefs, religious organization employers in Plaintiff States, such as Plaintiffs Catholic Social Services and Catholic Mutual, may simply cease the provision of health insurance coverage to their employees, rather than subsidize conduct and services in violation of their beliefs." (Compl. ¶ 84, ECF No. 1.) They continue, "If religious organization employers were to cease provision of health insurance in order to avoid the requirements of the Rule, an immediate and substantial spike in the number of enrollments in Plaintiff States' Medicaid programs would result, as many impacted employees would invariably shift to Medicaid to remain in compliance with the ACA's individual coverage mandate." (*Id.* ¶ 85.) Also, the plaintiffs allege that "religious organization employers operating in Plaintiff

---

7. I note in passing that the plaintiffs have referred me to no authority indicating that "hospitals, schools, and universities" are categorically excluded—or intended to be excluded—from the religious employer exception even if they satisfy all of the criteria listed in the regulation.

8. The defendants repeat their alternative argument that the individual plaintiffs lack standing because the temporary enforcement safe harbor will protect them until August 1,

2013, and the Rule will be amended before the safe harbor expires. (*See* Defs.' Br. at 19–20, ECF No. 31.) I shall briefly address this argument below when reviewing the issue of ripeness.

9. The State plaintiffs state that they are "are not bringing this suit as a *parens patriae* action." (Pl.'s Response Br. at 17, ECF No. 33; *see also id.* at 17–18; Defs.' Br. at 21–22, ECF No. 31.)

States will cease providing charitable services to persons who do not share their religious tenets, in an effort to qualify under the Religious Employer Exemption. Those people no longer served by such charitable services will place further pressure on Plaintiff States' Medicaid programs as they inevitably increase reliance on public resources for support." (*Id.* ¶ 87.)

The defendants argue that the State plaintiffs' allegations are insufficient to establish their standing to sue. (Defs.' Br. at 22–26, ECF No. 31.) The defendants are correct.

As noted previously, in order to satisfy the standing requirements of Article III of the United States Constitution, a plaintiff must show that "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, *not conjectural or hypothetical.*" *McClain v. American Economy Ins. Co.,* 424 F.3d 728, 731 (8th Cir.2005) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)) (emphasis added). A plaintiff must also show that "the injury is fairly traceable to the challenged action of the defendant," and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* Moreover, "[w]hen the plaintiff is not himself the object of the government action or inaction he challenges," as is the case here insofar as the State plaintiffs are concerned, "standing is not precluded, but it is ordinarily 'substantially more difficult to establish.'" *Summers v. Earth Island Institute,* 555 U.S. 488, 493–94, 129 S.Ct.

1142, 173 L.Ed.2d 1 (2009) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The Supreme Court has explained,

> [When a plaintiff's alleged injury arises from the government's allegedly unlawful regulation of someone else], causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.

*Lujan,* 504 U.S. at 562, 112 S.Ct. 2130 (citations omitted).[10]

The complaint does not allege that the State plaintiffs will suffer "'direct injur[ies]' resulting from the [defendants'] challenged conduct." *McClain,* 424 F.3d at 731. Instead, the State plaintiffs' theory of standing is based on layers of conjecture. First, the plaintiffs speculate that there are religious employers who are subject to the Rule's requirements and who will cease to provide health coverage to their employees in order to avoid subsidizing contraceptive services that conflict with their religious beliefs. Then, the plaintiffs speculate that if those employers

---

**10.** It merits emphasis that at this stage of the proceeding, the plaintiffs are not required to "adduce facts" showing that third parties will react in such a way that the causation and redressability elements of standing are met; rather, they need only allege facts that are sufficient to state plausibly that third parties

will act in such a way that the elements of standing are met. *See, e.g., Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 (explaining that the degree of support required for each element of standing differs at each successive stage of the case).

do elect to cease providing coverage, the employees of those organizations will seek (and obtain) Medicaid coverage from the States,[11] which will cause the States to suffer budgetary strain. Alternately, the plaintiffs speculate that religious organization employers who *do* continue to provide health coverage to their employees will attempt to qualify for the Rule's religious employer exemption by ceasing to provide charitable services to persons who do not share the organizations' religious views, and this in turn will cause those unserved persons to rely on State resources. Both alternatives allege hypothetical injuries to the States based on conjecture about the reactions of third parties, and the complaint simply does not allege facts showing that it is plausible—and not merely possible—that those reactions "have been or will be made" in the manner that the plaintiffs suggest. *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130.

In short, because the State plaintiffs' alleged injuries depend upon "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," the plaintiffs have the "substantially more difficult" burden of alleging facts showing plausibly that the independent actors will behave in such a way that the elements of standing can be met. *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130 (citation omitted). The complaint does not allege such facts; rather, it merely offers guesses about how independent actors will respond to the Rule and speculation that

these responses could cause people to qualify for, and obtain, state benefits that they would not otherwise seek, which will then strain the States's budgets.[12] This is not sufficient to establish standing. *Cf. County of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir.2004) (holding that "speculative harms based on the assumed future intent" of others do not establish injury in fact).

In opposition to the defendants' motion, the State plaintiffs repeat their claims that the Rule will threaten their budgetary stability when religious organization employers drop coverage for their employees (and thereby shift costs to the States). (*See* Pl.'s Response Br. at 14, ECF No. 33.) In support of their position, they refer me to data indicating that Medicaid spending "has expanded exponentially" and will continue to expand under the ACA generally. (Pls.' Response Br. at 14–16, ECF No. 33. *See also id.* at 25–26.) They add that "Plaintiff States have already demonstrated an interest in opposing the ACA as a whole due, in part, to the law's massive effect on the States' Medicaid program," and that their "interest in opposing the Final Rule … rests in part on related grounds." (*Id.* at 16. *See also id.* at 15 (discussing Medicaid spending attributable to "the ACA's other requirements" in combination with the speculated increases stemming from the Rule); *id.* at 26–27 (discussing the anticipated costs of ACA section 1311 and "the ACA's individual coverage mandate").) It is irrelevant, however, whether the State plaintiffs might have some interest in opposing the

---

11. The defendants correctly note that the plaintiffs' theory ignores—and likely conflicts with—the eligibility requirements for Medicaid. (*See* Defs.' Br. at 25 & n. 13, ECF No. 31 (citing 42 U.S.C. §§ 1396a(a)(10)(A)(i); 1396e(c)(2).))

12. It should be noted that the complaint does not show that it is plausible that any of the

organizations or individuals who are participating in this case as plaintiffs will respond to the Rule in such a way that the State plaintiffs' budgets will be strained; indeed, the complaint does not properly allege that any of the individual or organizational plaintiffs will be subject to the Rule at all. (*See supra* Parts III.A–B.)

ACA apart from the Rule, or that the ACA—taken as a whole—is expected to strain the State plaintiffs' budgets. To demonstrate standing to challenge the Rule, the State plaintiffs must establish an injury in fact that is traceable to the Rule. *See Lewis v. Casey,* 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law. As we have said, '[n]or does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.' ") (quoting *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). The State plaintiffs cannot rely on unrelated claims concerning different aspects of the ACA to establish standing in this action.

The State plaintiffs also argue that "[c]ourts have recognized states' economic interests [are] adequate to support a claim." (Pls.' Response Br. at 26, ECF No. 33.) In support of their argument, the State plaintiffs cite *Dixon v. Heckler,* 589 F.Supp. 1512 (S.D.N.Y.1984), and *Avery v. Heckler,* 584 F.Supp. 312 (D.Mass.1984). I find, however, that these cases are each distinguishable from the instant one.

In *Dixon,* the State of New York was permitted to intervene in an action challenging "the legality of the standards by which claims for [federal] disability benefits are evaluated." 589 F.Supp. at 1513. The State was allowed to intervene "as of right" pursuant to Federal Rule of Civil Procedure 24(a)(2) for two separate reasons. First, intervention was in order because there was a "threat of a possible federal take-over of the State's program if it refuse[d] to follow regulations it believe[d] to be illegal." *Id.* at 1515. Second—and for present purposes, more importantly—the State could intervene because it had an "economic interest in the proper administration of the federal disability programs." *Id.* at 1516. The State argued that "disabled individuals who are denied benefits because of the Secretary's unlawful regulations are compelled to turn to state and local public assistance programs upon which they would otherwise not have to depend," which in turn increases the costs of the state and local programs. *Id.* In response, the Secretary of the Department of Health and Human Services argued that this was "not a legally cognizable interest because the federal disability programs are intended only to benefit disabled individuals, not to ease the state's public assistance costs." *Id.* The court rejected the Secretary's argument, noting that "the legislative history of the [federal] programs shows that one of Congress' express purposes in establishing the programs was in fact 'to relieve state and local governments of the soaring costs of the existing programs.' " *Id.* (quoting *City of New York v. Heckler,* 578 F.Supp. 1109, 1121 (E.D.N.Y. 1984)). Thus, "the State's economic interest in the proper administration of federal disability benefits [was] adequate to support intervention." *Id.*

Although *Dixon* concerns intervention under Rule 24(a)(2), I shall assume, for the purposes of argument, that "the same reasons that support[ed] the State's right to intervene" in *Dixon* would also establish the State's "standing to challenge the Secretary's policies." *Dixon,* 589 F.Supp. at 1516 n. 7.[13] Nevertheless, I am not per-

---

**13.** *But see Avery v. Heckler,* 584 F.Supp. 312, 316 n. 3 (D.Mass.1984) ("An intervenor need

not have the standing necessary to initiate the lawsuit.")

suaded that the court's holding in *Dixon* should be applied here. Indeed, it seems to me that the connection between the Secretary's actions and the alleged economic injury to the State in *Dixon* is much more direct than the connection between the Rule and the alleged threats to the State plaintiffs' budgetary stability. The court found in *Dixon* that the federal programs at issue were intended to provide economic relief to state and local governments, and therefore the State of New York's interest in the proper administration of the federal disability benefits program supported its intervention (and presumably its standing). In contrast, here the State plaintiffs are not challenging a rule, regulation, program, or statute that is intended to provide states with economic relief, or is otherwise concerned with states' well-being. Rather, they are challenging a rule that may require non-grandfathered, non-exempted health plans to provide coverage for certain contraceptive services for women, despite some employers' and employees' religious objections to such services. Unlike the federal disability programs in *Dixon*, the Rule has no direct economic connection with the State plaintiffs. As explained above, a series of assumptions about third parties' possible responses to the Rule must be made before any connection can be drawn between the Rule and the State plaintiffs' budgetary stability, and this connection is too attenuated and speculative to establish standing.

Like *Dixon*, *Avery* also involved a State's attempt to intervene in a suit challenging the Secretary of Health and Human Services' decisions to terminate individuals' disability benefits. *See* 584 F.Supp. at 315. In *Avery*, the court granted the Commonwealth of Massachusetts' motion to intervene because the Commonwealth had an interest "in minimizing the number of terminated social security beneficiaries on its welfare rolls." 584 F.Supp.

at 316. In so doing, the court noted that the case involved challenges to "Title XVI (SSI)," which "replaced state-administered welfare programs providing the same coverage" and was "inten[ded] to provide fiscal relief for state and local governments." *Id.* The court also rejected the Secretary's argument that the Commonwealth "has not demonstrated that its injury is fairly traceable to the Secretary's allegedly illegal terminations," stating,

> The chain of causation alleged by the Commonwealth ... is not interrupted by "the independent action of some third party not before the court." All the links of the chain are before court: the Secretary promulgates regulations, which the Commonwealth implements, and which require the termination of benefits to some claimants, some of whom turn to the Commonwealth for financial support.

*Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)) (citation omitted). The court also distinguished *Avery* from *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C.Cir.1976), wherein a state was denied standing to sue in part because "nothing in the legislative history of the relevant statute indicated any concern for the well-being of states." 584 F.Supp. at 316. The reasons I have cited for distinguishing *Dixon* from the instant case are equally applicable to *Avery*.

I agree with the defendants that *Iowa ex rel. Miller v. Block*, 771 F.2d 347 (8th Cir.1985), is more instructive. In *Block*, the State of Iowa sought to compel the Secretary of the Department of Agriculture "to implement three federal agricultural disaster relief programs." *Id.* at 348. "In attempting to establish that it sustained an injury in fact," Iowa alleged "that, but for the Secretary's implementation of these disaster relief programs, agri-

culture production will suffer, which will dislocate agriculturally-based industries, forcing unemployment up and state tax revenues down. As a result, the State will face increased responsibility for the welfare and support of its affected citizens while its available tax revenues are declining." *Id.* at 353. The Eighth Circuit found that Iowa's "alleged injury is insufficiently proximate to the actions at issue and the remedy to be offered by this action an insufficient guarantee of solvency to warrant state standing in this case." *Id.* at 354. It seems to me that the connection between the Rule and the threat of budgetary strain for the State plaintiffs is at least as attenuated, if not more so, than the connection between Iowa's alleged injury and the defendant's actions in *Block.*

Finally, the plaintiffs argue that if I "first find[ ] that any of the individual or organization[al] Plaintiffs has standing, [I] need not determine whether Plaintiff States likewise have standing." (Pls.' Response Br. at 17, ECF No. 33.) Because all of the other plaintiffs lack standing, this argument is moot.

In summary, I find that the plaintiffs' allegations are insufficient to establish that the State plaintiffs have standing to sue in their own right. There are no allegations of direct injuries resulting from the Rule; instead, the State plaintiffs only speculate that third parties will respond to the Rule in such a way that the States' budgets will ultimately be strained. As a result, the State plaintiffs must be dismissed for lack of standing.

### 2. Prudential Standing Principles

Even if the State plaintiffs were able to establish Article III standing, I would dismiss their claims on the ground that they do not fall within the zone of interests protected by the First Amendment or RFRA.

Apart from the constitutional requirements of standing, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). For example, the Supreme Court "has required that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* at 475, 102 S.Ct. 752 (quoting *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The Court has explained,

Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing...." Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.

*Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citations and footnote omitted).

The State plaintiffs claim to have standing to bring claims, in their own right, under the First Amendment's Free Speech Clause, the First Amendment's

Free Exercise Clause, the First Amendment's Freedom of Association Clause, and RFRA. The defendants argue persuasively that these clauses and RFRA protect individual rights, not states's rights, (*see* Defs.' Br. at 26–27, 33–35, ECF No. 31), and the plaintiffs have offered no resistance to the defendants' argument, (*see generally* Pls.' Response Br., ECF No. 33.) I take it that the point is conceded, and therefore the State plaintiffs' claims are subject to dismissal on the alternate ground that they do not fall within the zone of interests protected by the relevant portions of the First Amendment and by RFRA.[14]

## D. Whether the Plaintiffs' Claims Are Ripe

None of the plaintiffs have established that Article III's standing requirements have been met. Therefore, there is no case or controversy before me, and the remaining issues raised by the defendants in support of their motion to dismiss are moot. Nevertheless, it merits mention that even if the plaintiffs were able to establish standing to sue, their claims are not ripe.

 Ripeness, or the question "whether the harm asserted has matured sufficiently to warrant judicial intervention," "bears close affinity" to the issue of standing. *Warth v. Seldin*, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *See also National Park Hospitality Association v. Dept. of Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) ("The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction' .... "

(citation omitted)). Ripeness "is a justiciability doctrine designed 'to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *National Park Hospitality Association*, 538 U.S. at 807–08, 123 S.Ct. 2026 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). To assess ripeness, courts must "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808, 97 S.Ct. 980 (citing *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. 1507). *See also Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 674 (8th Cir.2012) ("In assessing ripeness, we focus on whether the case involves 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " (quoting *281 Care Committee v. Arneson*, 638 F.3d 621, 631 (8th Cir.2011))).

"The fitness requirement is primarily meant to protect 'the agency's interest in crystalizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.' " *American Petroleum Institute v. EPA*, 683 F.3d 382, 387 (D.C.Cir.2012) (quoting *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 49

---

**14.** The defendants argue that the State plaintiffs' claims must be dismissed pursuant to Rule 12(b)(6) for the same reasons. (*See* Defs.' Br. at 33–35, ECF No. 31 (arguing that the State plaintiffs have failed to state a claim upon which relief may be granted because RFRA and the relevant clauses of the First Amendment do not protect states).) Although the State plaintiffs' lack of standing renders the defendants' argument moot, I agree with the defendants that the State plaintiffs have failed to state a claim upon which relief may be granted.

(D.C.Cir.1999)). "Among other things, then, the fitness issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Id.* (quoting *Atlantic States Legal Foundation v. EPA,* 325 F.3d 281, 284 (D.C.Cir.2003)). "Courts decline to review 'tentative' agency positions because doing so 'severely compromises the interests' the ripeness doctrine protects: 'The agency is denied the full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding, the integrity of the administrative process is threatened by piecemeal review of the substantive underpinnings of a rule, and judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince the agency to alter a tentative position.'" *Id.* (citing *Public Citizen Health Research Group v. Commissioner, Food & Drug Administration,* 740 F.2d 21, 31 (D.C.Cir.1984)).

■ The foregoing "institutional interests in the deferral of review" can be outweighed, however, if the deferral causes "immediate and significant" hardship. *American Petroleum Institute,* 683 F.3d at 389 (quoting *Devia v. Nuclear Regulatory Commission,* 492 F.3d 421, 427 (D.C.Cir. 2007)). However, "[c]onsiderations of hardship that might result from delaying review 'will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.'" *Id.* (quoting *Public Citizen Health Research Group,* 740 F.2d at 31).

The plaintiffs and defendants each argue that *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), supports their position on the ripeness issue. In *Abbott Laboratories,* the Supreme Court determined

that a pre-enforcement challenge to Federal Food, Drug, and Cosmetic Act regulations was fit for judicial determination because the challenged regulation was "quite clearly definitive"; there was "no hint that [the] regulation [was] informal, or only the ruling of a subordinate official, or tentative"; and the regulation "was made effective upon publication." 387 U.S. at 151, 87 S.Ct. 1507. As to the second prong of the ripeness inquiry, the Court found that judicial consideration was warranted because, in addition to the foregoing factors, "compliance [with the regulations] was expected," *id.* at 152, 87 S.Ct. 1507, which "put[ ] petitioners in a dilemma":

> If petitioners wish to comply they must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance—continued use of material which they believe in good faith meets the statutory requirements, but which clearly does not meet the regulation of the Commissioner—may be even more costly. That course would risk serious criminal and civil penalties for the unlawful distribution of "misbranded" drugs.

*Id.* at 152–53, 87 S.Ct. 1507.

■ As the plaintiffs correctly note, the fact that the complaint presents concrete legal questions for review weighs in favor of justiciability. *See Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. 1507. In addition, I agree with the plaintiffs that the Rule should be considered "definitive" by virtue of its formal promulgation. This fact carries limited significance, however, given the tentative nature of the Departments' position on religious accommodations to the ACA's contraceptive coverage requirements. In other words, although the Rule does settle the definition of "religious employer" for the purposes of the

contraceptive coverage exemption, it also states that the contraceptive coverage requirements will not be enforced until the Departments consider whether to adopt additional, broader religious accommodations. It seems to me that under these circumstances I should decline to review the defendants' tentative position on the scope of religious exemptions to the contraceptive coverage requirements. Adjudicating the plaintiffs' claims now would deny the Departments a full opportunity to modify their positions and undermine the interests of judicial economy.

This case is clearly distinguishable from *Abbott Laboratories* in important respects. In *Abbott Laboratories* (and in other cases upon which the plaintiffs rely), there was a clear expectation of conformity with the challenged regulation. *See* 387 U.S. at 151–52, 87 S.Ct. 1507. (*See also* Pls.' Br. at 19, ECF No. 33 ("When, as here, [regulations] are promulgated ... and the *expected conformity to them causes injury* cognizable by a court of equity, they are appropriately the subject of attack." (quoting *Abbott Laboratories*, 387 U.S. at 150, 87 S.Ct. 1507 (emphasis added))); ("If '*the enforcement of a statute is certain*, a preenforcement challenge will not be rejected on ripeness grounds.'" (quoting *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir.2008) (emphasis added))).) In the instant case, in contrast, a temporary enforcement safe harbor prevents the Rule from being enforced against the plaintiffs until August 1, 2013. Although the plaintiffs allege that the Rule will "absolutely" be enforced against them on that date, (*see, e.g.*, Compl. ¶ 74, ECF No. 1; Pls.' Br. at 19, ECF No. 33), the Rule itself states that it will be amended during the safe harbor period to accommodate religious objections to the contraceptive coverage requirements. Indeed, the amendment process

has already begun. In other words, although the definition of "religious employer" has been settled definitively, the contraceptive coverage requirements are not being enforced against non-grandfathered religious organizations that fail to satisfy that definition, and new means of accommodating the organizations are being contemplated. Thus, the Rule's impact upon the plaintiffs is not "sufficiently direct and immediate" to warrant judicial intervention. *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. 1507.

The plaintiffs argue that delaying judicial review would harm them because they must either "make immediate and significant changes to their health care coverage arrangements in contravention of their religious and moral beliefs" or "forgo health insurance altogether and face a steep civil penalty in doing so." (Pls.' Br. at 19, ECF No. 33.) In fact, however, this forced choice is neither imminent nor inevitable in light of the temporary enforcement safe harbor and the ANPRM.

Relatedly, the plaintiffs argue that the effects of the Rule are reaching them "now or in the immediate or near future" because they "must start making plans now to comply with the Final Rule and any inability to offer health insurance coverage will have a severe impact on [the organizational plaintiffs'] ability to retain and recruit employees." (Pls.' Response Br. at 20, ECF No. 33.) The complaint includes no allegations stating that the plaintiffs must begin planning now to comply with the Rule or that the Rule will affect the organizational plaintiffs' employee retention and recruitment efforts. Moreover, the plaintiffs' desire to plan for future contingencies that may never arise does not constitute the sort of hardship that can establish the ripeness of their claims,[15] particularly given the strength of the "institutional interests in the deferral

---

**15.** The plaintiffs' "hardship" argument is analogous to one rejected by the Seventh Cir-

of review" described above. *American Petroleum Institute*, 683 F.3d at 389. The complaint simply does not establish that the Rule has created the same sort of "direct and immediate" dilemma that confronted the petitioners in *Abbott Laboratories*.

The plaintiffs also argue that "the mere promise to take future action to accommodate religious objections to the contraceptive coverage requirements" in "future rulemaking" cannot defeat standing. (Pls.' Response Br. at 21, ECF No. 33. *See also id.* at 20–22.) I agree with the plaintiffs that the defendants cannot "stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way." *American Petroleum Institute*, 683 F.3d at 388. "If that were true, a savvy agency could perpetually dodge review." *Id.* (citation omitted). Here, however, the fact that the Rule itself describes the temporary enforcement safe harbor and the new proposed rulemaking dispels the notion that the defendants are engaged in review-evading gamesmanship. The "definite end date" to the amendment process (i.e., August 1, 2013), "further alleviates any con-

cern that [the defendants are] using a new rulemaking to evade review." *American Petroleum Institute*, 683 F.3d at 389.

Finally, the plaintiffs argue that "the harms alleged by the individual and [organizational] Plaintiffs here are of a sort to which ripeness analysis is especially sensitive." (Pls.' Response Br. at 23, ECF No. 33.) More specifically, they argue that the ripeness analysis is "relaxed" in First Amendment cases. (*Id.* (citing *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1116 (10th Cir.2008); *Currence v. Cincinnati*, 28 Fed.Appx. 438, 441 (6th Cir. 2002)).) It is true that "the chilling effect the challenged law may have on First Amendment liberties" merits consideration when a court assesses the ripeness of a claim. *Stout*, 519 F.3d at 1116. As explained previously, however, the plaintiffs in this case do not face a direct and immediate dilemma that involves the sacrifice of their First Amendment rights, and the defendants' position on the scope of the exemptions to the contraceptive coverage requirements is tentative—and under these circumstances, the plaintiffs cannot establish ripeness even under a relaxed standard.[16]

---

cuit in *Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 162 (7th Cir.1976). There, petitioners argued that the EPA's designations of certain areas for pollution studies caused them "uncertainty in their business operations" for a number of reasons. For instance, some petitioners argued that they would have to maintain capital "to cover the possible expenditure of funds for pollution control equipment" if the EPA issued more restrictive pollution requirements for the studied areas. The Seventh Circuit distinguished these claims of uncertainty from the harms discussed in *Abbott Laboratories*, noting that the petitioners "need not expend any funds at this time since there is no administrative directive to which they must comply," the petitioners did not "face any sanctions for noncompliance," and the alleged hardship did not have "the 'direct effect on the day-to-day business' of the petitioners which the Supreme Court found pres-

ent in *Abbott Laboratories*." *Bethlehem Steel Corp.*, 536 F.2d at 163. Here, as in *Bethlehem Steel Corp.*, the plaintiffs are not asked to comply with any contraception coverage requirements while rulemaking process continues, the plaintiffs face no sanctions for noncompliance with the contraception coverage requirements, and their alleged planning hardship is neither alleged in the complaint nor as palpable as the dilemma described in *Abbott Laboratories*.

**16.** In *Stout*, the plaintiffs had a legitimate fear of sanctions for their political actions because the Kansas Commission on Judicial Qualifications did not "affirmative[ly] disavow … an intention to prosecute" candidates for state judicial office for taking certain actions prohibited under the *Kansas Code of Judicial Conduct. See* 519 F.3d at 1118. In *Currence* the court determined that it was likely that the plaintiff would be injured by the city's

In summary, although the Rule that lies at the heart of the plaintiffs' complaint establishes a definitive, final definition of "religious employer," the ACA's contraceptive coverage requirements are not being enforced against non-exempted religious organizations, and the Rule is currently undergoing a process of amendment to accommodate these organizations. The plaintiffs face no direct and immediate harm, and one can only speculate whether the plaintiffs will ever feel any effects from the Rule when the temporary enforcement safe harbor terminates. This case clearly involves "contingent future events that may not occur as anticipated, or indeed may not occur at all," *Missouri Roundtable for Life v. Carnahan,* 676 F.3d 665, 674 (8th Cir.2012) (quoting *281 Care Committee v. Arneson,* 638 F.3d 621, 631 (8th Cir.2011)), and therefore it is not ripe for review.

None of the plaintiffs have established that they have standing to challenge the Rule, and even if I were to assume that they did have standing, their claims are not ripe.

**IT IS THEREFORE ORDERED** that the defendants' motion to dismiss, ECF No. 30, is granted, and the plaintiffs' complaint is dismissed without prejudice.

nudity ban, that the issue of whether the nudity ban violated the First Amendment was ready for judicial determination, and that the plaintiff faced a "direct and immediate dilemma in how to conduct his dance routine within the boundaries of the law." 28 Fed.Appx. at 441–42. Here, in contrast, the defendants have declared that religious employers will not be required to provide contraceptive coverage during the temporary enforcement safe harbor; new religious accommodations are being considered; and the plaintiffs are not facing a direct and immediate dilemma about whether to sacrifice their First Amendment rights in order to conform with the contraceptive coverage requirements.